UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| FORT SANDERS SEVIER MEDICAL CENTER<br>709 Middle Creek Road<br>Sevierville, TN 37864<br><br>      Plaintiffs,<br><br>      v.<br><br>MICHAEL O. LEAVITT, Secretary of the United States Department of Health and Human Services<br>200 Independence Ave., S.W.<br>Washington, D.C. 20201<br><br>      Defendant. | : <br> : <br> : <br> : <br> : Case No:<br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

## PLAINTIFFS' COMPLAINT

The above-named Plaintiff ("the Hospital"), by and through its undersigned counsel, states the following by way of Complaint against Michael O. Leavitt, Secretary of the Department of Health and Human Services ("the Secretary"):

## NATURE OF THE CASE

1. This action arises from the Secretary's failure to reopen certain of the Hospital's Medicare cost reports, recalculate its Medicare disproportionate share hospital ("DSH") adjustment, and to make such payments as called for by the recalculation, either directly or through the Secretary's intermediary. These payments are due and owing under the Medicare statute. The Hospital brings this action for mandamus to compel the

Secretary to perform his non-discretionary duty to reopen the Hospital's cost reports in order to recalculate and issue those payments.

## JURISDICTION

2.  This action arises under Title XVIII of the Social Security Act, 42 U.S.C. §1395 et seq. ("the Medicare statute"). The United States District Court for the District of Columbia has jurisdiction in this matter pursuant to 28 U.S.C. §1361 because (i) the Hospital has exhausted all available remedies related to this issue within the meaning of the statute (by either filing the appropriate requests for reopening and/or appeals or because such remedies are either unavailable as a matter of law or futile) and (ii) the Defendant has a clear, non-discretionary duty to act in this case.

## VENUE

3.  Venue is proper in this district court, pursuant to 28 U.S.C. §1391 and 42 U.S.C. § 1395oo(f)(1) and 42 C.F.R. § 405.1877(f).

## THE PARTIES

4.  Plaintiff, Fort Sanders Sevier Medical Center, is an acute care hospital and licensed Medicare provider located at 709 Middle Creek Road, Sevierville, Tennessee, and has been assigned Medicare provider number 44-0081. Fort Sanders Sevier furnishes inpatient and outpatient hospital services to patients entitled to benefits under the Medicare program.

5.  The foregoing hospital plaintiff is hereinafter referred to as "the Hospital."

6.  Defendant, Michael O. Leavitt, is the Secretary ("the Secretary") of the United States Department of Health and Human Services ("HHS") with offices in Washington D.C. HHS is the federal department which contains the Centers for

Medicare & Medicaid Services ("CMS"), the agency within HHS that is responsible for the administration of the Medicare program.

## FACTS

**A.     Background Facts: Medicare Reimbursement In General**

7.      Congress enacted the Medicare program (Title XVIII of the Social Security Act) in 1965. As originally enacted, Medicare was a health insurance program that furnished health benefits to participating individuals once they reached the age of 65.

8.      Among the benefits provided under Medicare are hospital services. For cost reporting years beginning before October 1, 1983, the Medicare program reimbursed hospital services on a "reasonable cost" basis. 42 U.S.C. § 1395f(b).

9.      In 1983, Medicare began reimbursing hospitals using the prospective payments system ("PPS"). 42 U.S.C. § 1395www(d). Under PPS, hospitals are paid a fixed amount for each of approximately 490 diagnosis-related groups ("DRGs"), subject to certain payment adjustments.

10.     The Secretary (or one or more of his predecessors, hereinafter collectively referred to simply as "the Secretary") has delegated much of the responsibility for administering the Medicare Program to CMS (formerly known as the Health Care Financing Administration or "HCFA").

11.     The Secretary, through CMS, contracted out many of Medicare's audit and payment functions to entities known as fiscal intermediaries.

12.     In order for a hospital to obtain Medicare reimbursement, it must, at the close of each fiscal year, submit to its intermediary a "cost report" showing both the costs

incurred by it during the fiscal year and the appropriate share of those costs to be apportioned to Medicare. 42 C.F.R. §§ 413.20(b), 413.24(f).

13. The intermediary then audits the cost report and informs the hospital of its final determination of the amount of Medicare reimbursement through a notice of program reimbursement ("NPR"). 42 C.F.R. § 405.1803.

14. A provider dissatisfied with its intermediary's determination may file an appeal with the Provider Reimbursement Review Board ("PRRB" or "Board") within 180 days of the date of the determination. 42 U.S.C. § 1395oo(a).

15. Alternatively, a dissatisfied provider may request that the intermediary reopen and revise a settled cost report within three years of the date that the determination was issued. 42 C.F.R. § 405.1885(a). Jurisdiction for reopening a decision under 42 C.F.R. §405.1885(a) rests exclusively with the administrative body that rendered the last determination or decision. 42 C.F.R. § 405.1885(c).

16. The regulations adopted by the Secretary and in force at all relevant times described in this complaint also required that an intermediary's determination be reopened under 42 C.F.R. § 405.1885(b) if, within the three-year period in which reopenings are permitted, CMS notifies the intermediary that the initial determination or settlement was inconsistent with applicable law. The version of 42 C.F.R. §405.1885(b) in effect at all relevant times referenced in this complaint stated that an intermediary's decision "shall be reopened and revised by the intermediary if, within the aforementioned 3-year period, the Centers for Medicare & Medicaid Services notifies the intermediary that such determination or decision is inconsistent with the applicable law, regulations, or general instructions issued by the Centers for Medicare & Medicaid Services. . . ." See 67

Fed. Reg. 50096 (August 1, 2002).[1]

### B. DSH Adjustments

17. Hospitals that serve a disproportionate share of low-income patients, like the Hospitals in this matter, are eligible for upward adjustments to their Medicare PPS payments.

18. The Secretary has delegated to CMS the authority to calculate and administer DSH adjustments as part of the PPS reimbursement system. CMS, in turn, delegates the responsibility to the fiscal intermediaries who notify hospitals of their DSH adjustments in their NPRs.

19. The intermediaries calculate the DSH adjustment by adding two fractions known colloquially as the Medicare Proxy and the Medicaid Proxy.

20. This case does not involve the Medicare proxy.

21. The Medicaid proxy includes, among other things, the number of "patient days" for patients who were eligible for medical assistance under a State plan approved under Title XIX:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter, but who were not entitled to benefits under Part A of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

---

[1] All citations to 42 C.F.R. § 405.1885(b) in this complaint, unless otherwise noted, refer to the version of the regulation that was in effect prior to August 1, 2002 and which applies to the claims in this complaint. The Secretary promulgated an amended regulation because the Circuit Court of Appeals for the District of Columbia directed the Secretary to make additional DSH payments to the hospital plaintiffs in <u>Monmouth Medical Center v. Thompson</u>, 257 F.3d 807 (D.C. Cir. 2001). <u>See</u> 67 Fed. Reg. 50096.

22. A larger number of patients in the numerator of the Medicaid proxy means a larger DSH adjustment for the Hospital.

**C. Medicaid and Medicaid Waivers**

23. Congress enacted the Medicaid program as part of Title XIX of the Social Security Act in 1965. Medicaid is a cooperative federal-state program that furnishes health care to persons who meet specified eligibility requirements, including low-income status.

24. States participating in the Medicaid program have a substantial amount of discretion in selecting the benefits provided under their Medicaid programs. 42 U.S.C. § 1396d. Nevertheless, all states must furnish certain minimum benefits under their Medicaid program, including inpatient hospital services. 42 U.S.C. §§ 1396(a)(10)(A), 1396(a)(1).

25. States also have some flexibility in establishing payment rates for hospital services under their Medicaid programs. 42 U.S.C. § 1396a(a)(13)(A).

26. States that participate in the Medicaid program are required to develop a State Plan for delivery of medical assistance and submit it to the Secretary for approval. 42 U.S.C. § 1396. Generally, the State Plan (also referred to as a "Title XIX State Plan" or "Medicaid State Plan") must comply with certain requirements of the Medicaid statute set forth in 42 U.S.C. § 1396a.

27. Some states, however, provide medical assistance through a demonstration project referred to as a "section 1115 waiver." 42 U.S.C. § 3115 (hereinafter "1115 waiver"). Under an 1115 waiver, the Secretary waives some of the requirements that a State Plan must meet as set forth in other sections of the Medicaid statute, such as

6

freedom of choice, comparability, and statewide applicability. The purpose of the 1115 waiver is to encourage states to develop innovative and efficient methods of delivering Medicaid coverage through experimental projects.

28.  When Congress enacted the 1115 waiver provision in 1962, it proclaimed, by statutory fiat, that valid 1115 waiver programs were deemed approved under Title XIX. The statute provides:

> The costs of such project which would not otherwise be included as expenditures under section 3, 455, 1003, 1403, 1603, or 1903 as the case may be, and which are not included as part of the costs of projects under section 1110, shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan or plans approved under such title.

29.  In some cases, 1115 waivers cover patients who otherwise could have been made eligible for traditional Medicaid under the State Plan requirements set forth in 42 U.S.C. § 1396a.

30.  In other cases, the 1115 waiver may provide for medical assistance to expanded eligibility populations of low income individuals who could not otherwise have been made eligible for traditional Medicaid under existing State Plan requirements. These are referred to by CMS as "expansion populations."

31.  CMS has acknowledged that one purpose of the 1115 waiver is to extend Title XIX matching payments to services furnished to populations that otherwise could not have been made eligible for traditional Medicaid. CMS has acknowledged that the statute allows for expansion populations to be treated as traditional Medicaid beneficiaries. 65 Fed. Reg. 3136 (Jan. 20, 2000).

32. The State of Tennessee had a valid 1115 waiver in place during all of the relevant fiscal periods referenced in this Complaint that afforded medical assistance to the expansion populations described in the foregoing paragraph. Tennessee called its waiver program "TennCare."

**D.  Section 1115 Waiver Days and the DSH Calculation**

33. Patient days for which a patient was eligible for TennCare should have been included in the numerator of the Medicaid proxy by the Secretary and his intermediaries because TennCare was a section 1115 waiver program approved under Title XIX.

34. Notwithstanding the fact that expansion populations, including TennCare patients, are comprised of patients eligible for medical assistance under a State Plan approved under Title XIX, the Secretary interpreted the Medicare statute so as to exclude patient days of service for these patients from the Medicaid proxy of the DSH calculation. The Secretary issued numerous binding policy statements and memoranda prohibiting providers from claiming, and intermediaries from counting, expansion populations in the DSH calculation. For example, CMS issued a policy statement in 1999 that, among other things, prohibited the inclusion of expansion populations in the Medicaid proxy. Program Memorandum No. A 99-62 (Dec. 1999).

35. In computing the Hospitals' DSH adjustments for the fiscal years identified in the Complaint in the present matter, the respective Medicare intermediaries did not include patient days for expansion populations. The exclusion of these Title XIX days unlawfully reduced the Plaintiffs' DSH adjustments.

E.   **In 2000, The Secretary Changed His Treatment Of Expansion Populations So As To Include Them In The DSH Calculation, Thereby Giving Notice That The Prior Policy Was Inconsistent With The Medicare Statute.**

36.   On January 20, 2000, the Secretary corrected his treatment of expansion populations so as to require their inclusion in the DSH calculation. Specifically, the Secretary issued an Interim Final Rule on January 20, 2000 which reversed his long-standing exclusion of expansion populations and permitted inclusion of expansion populations in the Medicaid fraction for discharges on or after January 20, 2000. 65 Fed. Reg. 3136 (Jan. 20, 2000).

37.   The Interim Final Rule operated prospectively only. CMS promulgated a Final Rule on August 1, 2000 that was exactly the same:

> Effective with discharges occurring on or after January 20, 2000, for purposes of counting days under paragraph (b)(4)(I) of this section, hospitals may include all days attributable to populations eligible for Title XIX matching payments through a waiver approved under section 1115 of the Social Security Act.

42 C.F.R. § 412.106(b)(4)(ii); see 65 Fed. Reg. 47108 (Aug. 1, 2000).

38.   The Interim Final Rule and the Final Rule served as notice under 42 C.F.R. § 1885(b) that prior determinations (which had excluded expansion populations) were inconsistent with applicable law, specifically the Medicaid Proxy of the DSH calculation.

39.   Pursuant to the reopening provision found in 42 C.F.R. § 405.1885(b), the Secretary, when he corrected his policy prospectively on January 20, 2000, should have directed the intermediaries serving Tennessee to reopen the Hospital's final determinations for all cost report years that were the subject of NPR's received during the

prior three years and to recalculate the DSH adjustment with the expansion populations included.

40. The intermediary issued Fort Sanders Sevier Medical Center an NPR for its cost report for fiscal year 1994. The intermediary, however, never revised or amended its determinations so as to include expansion populations in the hospital's DSH calculation.

41. The intermediary issued Fort Sanders Sevier Medical Center an NPR for its cost report for fiscal year 1995. The intermediary, however, never revised or amended its determinations so as to include expansion populations in the hospital's DSH calculation.

42. The intermediary issued Fort Sanders Sevier Medical Center an NPR for its cost report for fiscal year 1996. The intermediary, however, never revised or amended its determinations so as to include expansion populations in the hospital's DSH calculation.

43. The intermediary issued Fort Sanders Sevier Medical Center an NPR for its cost report for fiscal year 1997. The intermediary, however, never revised or amended its determinations so as to include expansion populations in the hospital's DSH calculation.

44. The intermediary issued Fort Sanders Sevier Medical Center an NPR for its cost report for fiscal year 1998. The intermediary, however, never revised or amended its determinations so as to include expansion populations in the hospital's DSH calculation.

45. The intermediary issued Fort Sanders Sevier Medical Center an NPR for its cost report for fiscal year 1999. The intermediary, however, never revised or amended its determinations so as to include expansion populations in the hospital's DSH calculation.

46. The intermediary issued Fort Sanders Sevier Medical Center an NPR for its cost report for fiscal year 2000. The intermediary, however, never revised or amended its determinations so as to include expansion populations in the hospital's DSH calculation.

47. Based on the Hospital's past experience, the amount of under-reimbursement for each cost report period was approximately $150,000.

## COUNT I
## MANDAMUS

48. Paragraphs 1 – 47 are incorporated herein by reference as if fully set forth at length below.

49. CMS, by issuing the Interim Final Rule, announced a finding that the Secretary's earlier interpretation—that expansion populations should be excluded from the Medicaid Proxy of the DSH calculation—was inconsistent with the actual text and intent of the Medicare statute requiring that all days for which patients were eligible for medical assistance under a State Plan approved under Title XIX should be included in the DSH calculation. See 65 Fed. Reg. 3136 (Jan. 20, 2000).

50. As a matter of law, the Interim Final Rule's requirement that expansion populations be included in the DSH calculation was binding on the Secretary as well as all Medicare intermediaries.

51.     According to the version of the reopening regulation (42 C.F.R. § 405.1885(b)) that was in effect at the time: "A determination or a hearing decision rendered by the intermediary shall be reopened and revised by the intermediary if, within the aforementioned 3-year period, the Centers for Medicare & Medicaid Services notifies the intermediary that such determination or decision is inconsistent with the applicable law, regulations, or general instructions issued by the Centers for Medicare & Medicaid Services . . . ." Id.

52.     As a result of the Interim Final Rule, the intermediary, pursuant to 42 C.F.R. §405.1885(b), had an affirmative, non-discretionary duty: (i) to reopen and revise the Hospitals' cost reports for all cost report periods that were the subject of NPR's (or revised NPR's) that did not include expansion populations in the Medicaid Proxy of the DSH calculation, irrespective of whether the Hospitals requested reopening, (ii) to include those patient days in the Medicaid proxy of the Hospital's DSH calculation that are required to be included by the Medicare statute, including but not limited to expansion populations, (iii) to issue payment reflecting the increased DSH adjustment for each of the affected years, and (iv) to grant all reopening requests, irrespective of whether those reopening requests specifically sought reimbursement for expansion populations, so that the intermediary could include expansion populations in plaintiff's DSH calculation and thereafter issue payment for plaintiff's increased DSH adjustment for those cost report periods. See 42 C.F.R. § 405.1885(b).

53.     For those Hospitals that fell below the threshold for obtaining DSH, but would meet the threshold with the inclusion of expansion populations or other Medicaid patient days, the intermediary had a duty to reopen the Hospital's cost reports, include all

patient days as required by the Medicare statute, and make payment to the Hospitals according to the Medicare statute's DSH provisions.

54.     As the courts have consistently agreed, the Medicare statute requires that all Medicaid patient days, including Medicaid expansion populations, be included in the Medicaid Proxy of the DSH calculation. The Secretary should be compelled to reopen all the cost report periods referenced in this complaint pursuant to 42 C.F.R. § 405.1885(b).

**WHEREFORE**, the Hospital requests that the Court enter an Order and issue a writ of mandamus:

(i)     Directing the Secretary and/or his intermediaries, within 30 days, to reopen the Hospital's cost reports pursuant to 42 C.F.R. § 405.1885(b) for all of the time periods referenced in the Hospital's Complaint;

(ii)    Directing the Secretary and/or his intermediaries to recalculate the DSH calculation using the expansion populations and the patient days required by the Medicare statute;

(iii)   Directing the Secretary and/or his intermediaries to pay the Hospital, within 90 days,

(iv)    Directing the Secretary to pay the additional amounts determined through the reopening process, together with an award of both pre-judgment and post-judgment interest on the additional amounts determined throughout the reopening process;

(v)     Stating that this Court retains jurisdiction in this matter until the Secretary and/or his intermediaries have completed the reopening process, up to and including issuing revised NPR's and payment where applicable;

(vi)    Requiring the Secretary to submit for the Court's prior approval any further instructions provided to the intermediaries with regard to implementing this Court's ruling;

(vii)   Awarding the Hospital attorney's fees and costs, as permitted by law; and

(viii)  Awarding such other monetary and equitable relief as this Court deems just and appropriate or may be necessary to effectuate any aspect of the Court's award.

Respectfully submitted,

*Jacqueline E. Bennett*

Murray J. Klein
DC Bar #492415
Jacqueline E. Bennett
DC Bar #474355
**REED SMITH LLP**
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, DC  20005
(202) 414-9200
(202) 414-9299 facsimile
JBennett@ReedSmith.com

Dated:  January 20, 2006